**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 06-60554-CIV-RYSKAMP/TORRES

JAMES FALLER,

    Petitioner,

vs.

UNITED STATES OF AMERICA,

    Respondent.
_____/

**REPORT AND RECOMMENDATION ON PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO TITLE 28 U.S.C. § 2255 and ORDER ON MOTION FOR LEAVE TO FILE LARGE VOLUME OF DOCUMENTS**

This matter is before the Court on James Faller's Petition for Writ of Habeas Corpus pursuant to title 28 U.S.C. § 2255 [D.E. 2].[1] The United States of America ("Government") responded [D.E. 21-1] and James Faller ("Petitioner") replied. [D.E. 26]. Each party filed a supplemental brief [D.E. 30, 61]. Petitioner then filed an additional reply [D.E. 62], an Emergency Notice of Receipt of New Brady Material [D.E. 63], and a Notice of Additional Brady and Jencks Act Violations [D.E. 72]. Petitioner's Motion for Leave to File Large Volume of Documents, requesting leave to file 20,000 documents in support of this habeas petition, is similarly at issue. [D.E. 68].

The Court has carefully reviewed the record and the arguments presented, as well as the prior proceedings and trial transcript in the underlying criminal case.[2] For the reasons

---

[1] This matter was referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636.

[2] *See United States v. Adam, et al.,* No. 97-CR-6063-RYSKAMP/VITUNAC.

that follow, we recommend that the Court deny the Petition for Writ of Habeas Corpus. We also deny Petitioner's Motion for Leave to File Large Volume of Documents.

## I.     BACKGROUND

### A.     *Case History*

In May, 2000, Petitioner was convicted in federal court of conspiracy to commit mail and wire fraud, and money laundering.[3] According to the Government, Petitioner took part in a scheme wherein investors would pay an advanced fee in exchange for a large loan. The objective was simple: keep the advance fees without providing the loans. Despite the fact that Petitioner's company International Business Service Alliance, Inc. ("IBSA") had yet to fund a single loan, in his sales pitch Petitioner promised his prospective investors that IBSA *had* previously funded loans. As the Government explained in closing arguments:

> "All of [the fraud victims] reported having been told by Murray or Faller, and in a few cases by both of them, that IBSA had funded loans previously. Several of them were told by Mr. Faller that they had personally funded loans through IBSA. Two of them were told by Defendant Faller that he had personally been involving in funding two loans in Europe in the summer of '93." [42-1 at 22]**.**
>
> "[Numerous applicants] asked Defendant Faller the obvious question: Have you funded these loans before? ... Faller's response was much like the one that his colleague Barbara Murray often gave. Yes, we have funded these loans before." [D.E. 42-1 at 44-45].

(T.R. May 24, 2000, p. 20 at 17-25, p. 42 at 24 - p. 43 at 4). The Government successfully argued that IBSA had never funded loans, that Petitioner knew IBSA had never funded loans, and that Petitioner nevertheless continued to solicit advanced fees using fraudulent sales tactics:

---

[3] We adopt the detailed facts underlying the fraud scheme as summarized in *United States v. Murray, et al.,* 154 Fed. Appx. 740, 742-43 (11th Cir. 2005). With respect to this petition, the record further provides the basis for the summary of facts that are material to the issues presented, as well as any findings that may be found in the analysis portion of this report and recommendation.

> "Rolan Colon and James Faller had a conversation, and in that conversation [Faller was told] that none of the clients in Stamford, none of the Stamford loans had been funded ... Mr. Faller was not fazed by these revelations ... [and] went back to doing what he did best: Marketing loans and inducing clients to pay advance fees with claims that Richard Adam had funded loans or that he himself and his colleagues had previously funded loans." [D.E. 42-1 at 46]

(T.R. May 24, 2000, p. 44 at 1-18). The Government also successfully conveyed to the jury that Petitioner, Mr. Colon, and another colleague formed First Quantum International ("FQI") for the purpose of conducting a similar advanced loan scheme.

The crux of the Government's case was that Petitioner falsely promised his prospective loan applicants that loans had been funded to other applicants:

> Q. Did you and Mr. Faller have any conversation about prior successes in funding loans?
> A. Yes, we had asked if they had done this kind of thing before and he indicated that they had.
> Q. So he told you that they had funded loans previously?
> A. Yes.

*Testimony of Robert Cameron* (T.R. May 11, 2000, p. 144 at 10-16)

> Q. What if anything did Mr. Faller state to you he had funded other loans in the past as to funding?
> A. It was easy loan. He had made loans for billions of dollars.

*Testimony of Kent McElhaney*, (T.R. May 17, 2000, p. 521 at 1-4).

> Q. Prior to the conclusion of the meeting did you have occasion to discuss with Mr. Faller whether or not he was aware of any loans that had been previously funded?
> A. Yes. He said many were funded in the Fort Lauderdale office.
> Q. Did you ask him for the names of any persons that had been funded?
> A. He said that due to confidentiality he could not give that out.

*Testimony of Steven Vergote* (T.R. May 17, 2000, p. 470 at 7-16). Put another way, the Government's theory was not that the loans were impossible to fund, but rather that the Petitioner lured his victims with promises of past successes at funding when, in truth, no would-be borrowers ever received loan funding.

Petitioner was sentenced in February, 2003 to 24 months in prison, followed by three years of supervised release. Petitioner appealed and the Government cross-appealed. On January 20, 2006 the conviction was upheld but the sentence was vacated. The Court held re-sentencing of Petitioner on April 20, 2006, and the Government again appealed the Petitioner's sentence. The Eleventh Circuit Court of Appeals dismissed the Government's appeal with prejudice on September 20, 2006, finalizing Petitioner's sentence. [D.E. 70].

### B.      *The "Perez Documents" and "Post-Perez Documents"*

In July, 2003, approximately three years after Petitioner was convicted, Maria Elena Perez, Esq., counsel for lead defendant Richard Adam, went to the United States Attorney's Office in West Palm Beach for a discovery conference.[4] While Ms. Perez was reviewing boxes of documents she came across material that was not bate stamped, leading her to believe that this material was never disclosed to the defense. The material consisted of thousands of pages of bank records and interviews of government witnesses, including FBI 302s and notes from the prosecutor. [D.E. 5]. Ms. Perez copied these documents ("Perez Documents") and notified Petitioner's counsel of her discovery. Petitioner's counsel finally obtained copies of the Perez Documents in August, 2004.

Not only does Petitioner maintain that the Perez Documents contain exculpatory evidence, but also that the Perez Documents reference *additional* exculpatory evidence. Over the next several years, Petitioner gradually recovered the "fruit" of the Perez Documents ("Post-Perez Documents"):

> In reviewing the new material, it is clear that over 5,000 of those documents contained *Brady* material. Through those 5,000 documents containing *Brady* material, Faller and Murray have been led to an additional 20,000 documents which contain *Brady* material ... The documents recovered thus far number over

---

[4]      Mr. Adam was arrested in Canada, but fought extradition and was not tried with Petitioner.

> 70,000 however, Faller has culled the *Brady* material down to approximately 20,000.

[D.E. 68 at 1-2].

The Government insists Petitioner's attorneys were given full access and the opportunity to duplicate all discoverable evidence in the Government's possession. To support this position, the Government relies on the affidavits of Paralegal Gregory Arthur Baker, Assistant Federal Public Defender Robert E. Adler, and ex-AUSA James McAdams, III [D.E. 21-4, 21-5, 21-6]. Both Mr. Baker and Mr. Adler corroborate the notion that there was an open discovery process and that they complied with discovery rules.[5] Only Mr. McAdams, however, speaks to the material at issue in this habeas petition, and he explains the origin of the Perez Documents:

> At the conclusion of the trial of Murray and Faller in 2000, Mr. Baker had organized all of the government evidence, reports, correspondence, etc., and placed those materials in boxes and filing cabinets in a room at the U.S. Attorney's Office. Interspersed among those materials was government work product, that is, notes by Mr. Hopkins and me, a fact that during the lapse of time prior to Adam's extradition I had forgotten. Accordingly, unintentionally, the government allowed Ms. Perez to review and duplicate those materials which were certainly beyond the scope of both the Court's discovery order and Rule 16 of the Federal Rules of Criminal Procedure.

---

[5]  Mr. Baker was assigned as a senior paralegal to the litigation support team with the United States Attorney's Office in West Palm Beach, Florida. From May 1998 to June 2000, he provided litigation support and document management exclusively on the case of United States v. Adam, Faller, Murray, et al and reported to Senior Assistant United States Attorneys James G. McAdams and James Hopkins. Specifically, Mr. Baker was responsible for making case documents and other evidence obtained during the course of the Government's investigation and prosecution available to Petitioner and his co-defendants. He recalls multiple occasions when Petitioner's counsel visited the United States Attorney's Office in West Palm Beach for extended periods to review and copy case documents in the Government's possession.

Mr. Adler was an Assistant Federal Public Defender, and briefly represented co-defendant Rolan Colon before having to withdraw due to a client conflict. Mr. Adler recalls that he began discovery review at a government office where the discovery was housed in file cabinets. In his own words, it was a "very open discovery process in that I was given free access to the documents."

[D.E. 21-4 at 11]. In short, the Government acknowledges purposefully withholding the Perez Documents because, the Government posits, the Perez Documents were not subject to disclosure, and that the failure to produce the material did not violate the Federal Rules of Criminal Procedure or Petitioner's constitutional rights. With respect to the Post-Perez Documents, the Government maintains that they never had these materials in their possession and that they are not exculpatory in any event.

## *II.   ANALYSIS*

"A prisoner in custody under sentence ... claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States ... may move the court which imposed the sentence to vacate, set aside, or correct the sentence." 28 U.S.C. § 2255. Collateral relief under section 2255 "is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised on direct appeal and would, if condoned, result in a complete miscarriage of justice." *Lynn v. United States,* 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted). Generally, only constitutional, jurisdictional, and fundamental error claims are properly raised in a section 2255 motion. *United States v. Addonizio*, 442 U.S. 178, 184-86, 99 S. Ct. 2235, 60 L. Ed. 2d 805 (1979).

Petitioner asks this Court to vacate his conviction and sentence for Government violations of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) (holding that the State's failure to provide defendant with favorable material evidence violates due process), *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972) (holding that a defendant's due process right is violated when the State knowingly allows false, material testimony to be presented at trial), and 18 U.S.C. § 3500 (the "Jencks Act") ("After a witness called by the United States has testified on direct examination ... [the United

States] shall produce any statement ... which relates to the subject matter as to which the witness has testified.").

Petitioner raises other challenges to his sentence, such as ineffective assistance of counsel and prosecutorial misconduct [D.E. 2 at 4]. There is no basis to vacate his conviction on these particular grounds because Petitioner does not cite to a single case, and offers no credible argument to support these claims. The only argument in support of his claim for prosecutorial misconduct is the Government's failure to turn over *Brady*, *Giglio*, and Jencks material. In that same vein, he argues his lawyer was ineffective because the lawyer was not privy to this potentially exculpatory evidence, and could thus not effectively cross examine witnesses. As a practical matter, Petitioner's claims, if any, lie in *Brady*, *Giglio*, and Jencks.

At its core, Petitioner's motion argues that the Perez Documents and Post-Perez Documents prove that he was a *victim* of the charged crimes, not a perpetrator.[6] We thus portion our discussion of Petitioner's section 2255 arguments in two. First, we review the Perez Documents, and explore whether the purported violations of *Brady*, *Giglio*, and Jencks warrant relief under section 2255. With respect to the Post-Perez Documents, we address whether the discovery of this new material warrants a new trial.

---

[6] To the extent Petitioner seeks relief for the late disclosure of documents the Government disclosed during trial, we reject that claim. Petitioner filed a motion for a new trial alleging that the Government withheld *Brady* and Jencks material. Judge Ryskamp, adopting Magistrate Judge Vitunac's Report and Recommendation, denied Petitioner's post-trial motion. Petitioner then appealed, and the Eleventh Circuit found no material conflict between the FBI witness statements and their testimony at trial. *Murray, et al.,* 154 Fed. Appx. at 743 ("[T]he district court did not err in refusing to grant a new trial on the basis of the allege *Brady* violations). In light of the fact that this issue has been reviewed by the Magistrate Judge, District Judge, and Eleventh Circuit, we find no authority that would entitle Petitioner a fourth bite at the apple. *See, e.g., United States v. Escobar-Urrego*, 110 F.3d 1556, 1561 (11th Cir. 1997) ("[A] decision of a legal issue or issues ... establishes the 'law of the case' and must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal in the appellate court.") (citations omitted).

### A.     *Perez Documents*

In part, the Perez Documents consist of documents related to Truman Bidwell, co-Defendant Murray's attorney from New York ("Bidwell Documents") [D.E. 26 at 68-83; D.E. 62-1 at 50-65].  The Bidwell Documents consist of letters and facsimiles to and from Mr. Bidwell, Government counsel's notes from an interview with Mr. Bidwell, and a typed document of "statements attributable to Truman Bidwell." [D.E. 26 at 69-70].  Petitioner argues that the Bidwell Documents contain "numerous FBI 302's of statements of witnesses who could have been called by Faller ... [and they show] that Bidwell specifically told one client of IBSA that a loan had been funded, the virtual underpinning of the Government case that no one had ever been funded." [D.E. 26 at 15].  Furthermore, Petitioner maintains that the Bidwell Documents contradict the "false" trial testimony of Government witness Martin Hopwood.  The Government responds that the material is not exculpatory because it does "nothing to reverse the fact that both petitioners had repeatedly told the borrower/victims that they *knew* that loans had been funded in the past and would be funded to them." [D.E. 61 at 6].

Additionally, Petitioner's motion includes a number of letters and documents from an attorney named Steven Brenners ("Brenners Documents") [D.E. 62-2 at 9-31].  Mr. Brenners sent letters to prospective IBSA borrowers/victims assuring loan funding, although he apparently had no first hand knowledge of the loan funding and only reiterated Richard Adam's promises.  There is one handwritten note in particular that Petitioner points out, a facsimile sent from Mr. Brenners to Rolan Colon (a co-Defendant) that reads as follows: "Dear Rolan, [e]nclosed is the statute we spoke about.  My review of the statute indicates that since IBSA is licensed, everything is O.K. - Steve (see § 687.14(4) and § 687.141)." [D.E. 62-2 at 9].  According to Petitioner, this facsimile is "the most compelling evidence of Faller's reliance on

a good faith defense that he relied on lawyers assertions that Adam and IBSA were legitimate." [D.E. 2 at 16]. Mr. Brenners was not a government witness, and the Government argues simply that the documents are not exculpatory and do not constitute Jencks material. [D.E. 61-1 at 8].

Petitioner then focuses on material from the Luxembourg Police Department investigation of Richard Adam ("Luxembourg Documents"). [D.E. 26 at 52-65]. One police report, according to Petitioner, "is yet another official document containing *Brady* material showing that the [Government] witness, Regis Hempel was in fact an originating partner of Adam and not a Luxembourg dignitary as he was introduced to the Jury by the Government." [D.E. 26 at 11-12]. Notably, the police report notes that Mr. Hempel actually had problems with Adam and resigned from IBSA. The Luxembourg Documents also contain an "interview of Luxembourg attorney Rene Weber where Weber tells the Government that he domiciled First Quantum in his office for Adam for a fee," a copy of a letter to the Luxembourg police showing all of the accounts of Adam at that particular bank, and bank checks issue by Adam to attorney Weber. [D.E. 26 at 12]. The Government's response to Petitioner's claim with respect to the Luxembourg Documents: "We are simply at a loss to explain the potential relevance of these documents, much less how they could be deemed to be exculpatory for the petitioners" [D.E. 61 at 9].

We have reviewed the Perez Documents attached by Petitioner in support of his request for habeas relief, although we do not summarize each document individually. To recap, Petitioner argues that the failure to disclose the Perez documents constitutes violations of *Brady*, *Giglio*, and Jencks and warrants habeas relief under section 2255. We disagree.

### 1. *Brady*

In order to safeguard a defendant's due process rights, certain types of evidence require disclosure. Among these is exculpatory evidence that is material to guilt or punishment. *Brady v. Maryland,* 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *see, e.g. Moon v. Head*, 285 F.3d 1301 (11th Cir. 2002). This duty does not extend so far as to require disclosure of neutral, irrelevant, speculative, or inculpatory evidence, *see United States v. Lindsey*, 482 F.3d 1285 (11th Cir. 2007), inferences gleaned from the evidence, *see United States v. Flores-Sandoval*, 94 F.3d 346, 353 (7th Cir. 1996), evidence over which the government has no control, *see United States v. Shryock*, 342 F.3d 948, 983 (9th Cir. 2003), or evidence that is available to the defense from other sources, *see United States v. Cook*, 170 Fed. Appx. 639, 640 (11th Cir. 2006). Evidence that the government failed to disclose to the defendant is considered collectively, not item-by-item, in determining whether the materiality requirement of *Brady* was violated. *Kyles v. Whitley*, 514 U.S. 419, 436-37, 115 S. Ct. 1555, 1567, 131 L. 3d. 2d 490 (1995); *McMillian v. Johnson*, 88 F.3d 1554, 1570 (11th Cir. 1996).

Strictly speaking, there are three main components of a "*Brady* violation": (i) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (ii) that the evidence must have been suppressed by the State, either willfully or inadvertently; and (iii) prejudice must have ensued. *See, e.g., Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).[7] Prejudice is established if "a

---

[7] The Eleventh Circuit has also portioned the *Brady* analysis into a four-factor test. In order to establish a *Brady* violation, a defendant must show: "(1) that the [G]overnment possessed evidence favorable to the defense, (2) that the defendant did not possess the evidence and could not obtain it with any reasonable diligence, (3) that the prosecution suppressed the evidence, and (4) that a reasonable probability exists that the outcome of the proceeding would have been different had the evidence been disclosed to the defense." *Spivey v. Head*, 207 F.3d 1263, 1283 (11th Cir. 2000). As a practical matter, these factors are fully embodied in the three-pronged test once the additional principles governing *Brady* claims are taken into consideration.

reasonable probability [exists] that had the [unpresented] evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. 97, 109-110, 96 S. Ct. 2392, 2400, 49 L. Ed. 2d 342 (1976).

After a careful review of the Perez Documents, we find that the Government did not commit a *Brady* violation entitling Petitioner to relief under section 2255. *See Kyles*, 514 U.S. at 436-37 ("[T]he Constitution is not violated every time the government fails to or chooses not to disclose evidence that might prove helpful to the defense.") (citing *Bagley*, 473 U.S. at 675). Without more, a showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation. *Kyles*, 514 U.S. at 437. The Perez Documents were largely irrelevant, speculative, and, in some instances, actually inculpatory.[8] Furthermore, most of the documents were readily available to Petitioner's counsel from other sources, either through Petitioner's co-Defendants, or via public records requests.[9] Petitioner's argument that "the District Court could not properly apply the materiality analysis established in *Kyles* because the bulk of the newly discovered evidence has not been

---

[8] For instance, a police report in the Luxembourg Documents reads: "Mr. Adam and his company IBSA, which moreover has offices in Stamford, Fort Lauderdale and Tampa, U.S.A., are being considered by foreign law enforcement authorities in connection with crimes such as fraud, attempted fraud, forgery and used of forged bank records, and laundering of illegal funds." [D.E. 26 at 58-69]. Evidence questioning the legitimacy of IBSA is arguably damaging given Petitioner's involvement with the company.

[9] As an example, Murray's defense lawyer acknowledged having access to the Bidwell Documents: "There is no question that we had them and that we are not objecting to our lack of having them ... in fact, the Government counsel and I had discussed the Government's accessing them, and Government counsel was very forthright." [D.E. 61 at 6-7].

discovered," is misplaced. Logically, if the evidence has yet to be discovered, then it is impossible for this Government to have committed a *Brady* violation.

Assuming *arguendo* the documents had some degree of exculpatory and impeachment value, and that the only source of the material was via the Government, Petitioner fails to establish prejudice, i.e. that the trial result would have been different had the Government disclosed the Perez Documents. *Bagley*, 473 U.S. at 682.  The Government's case focused on Petitioner's fraudulent solicitations to prospective loan applicants, but the Perez Documents in no way refute that charge.  In this case, disclosure of the suppressed evidence to Petitioner would not have made a different result reasonably probable in the underlying trial. *Kyles*, 514 U.S. at 441.  Consequently, we find no *Brady* violation, and deny relief pursuant to section 2255.

## 2. *Giglio*

Petitioner also claims he is entitled to habeas relief because the prosecutor knowingly used and exploited false testimony, a so-called *Giglio* violation.  Under *Giglio,* a defendant's due process rights are violated when the prosecution knowingly fails to correct a material falsehood in the testimony of any witness. *See, e.g., Foster v. United States*, No. 05-CV-ORL-18KRS, 2007 WL 1655364, at *4 (M.D. Fla. June 7, 2007) (citing *Giglio*, 405 U.S. at 153-54). This rule covers not only inculpatory false testimony, but also falsehoods tending to enhance to credibility of a witness. *Id.*  To establish a *Giglio* violation, Petitioner "must establish that: (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material -- i.e., what there is 'any

reasonable likelihood' that the false testimony 'could .. .have affected the judgment.'" *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006) (quoting *Giglio*, 405 U.S. at 154).[10]

Petitioner targets several instances where the Government allegedly elicited false testimony, but in every instance misses the mark. For example, he claims that Martin Hopwood falsely testified that Mr. Bidwell did not have an opinion on the viability or legality of the loan transactions. [D.E. 2 at 18]. This argument does not satisfy either *Giglio* prong. First, Petitioner fails to establish that the testimony was false or perjured. Second, the viability of the loan transactions was essentially a non-issue at trial. This testimony was ancillary to Government's position that Petitioner promised would-be investors that IBSA had previously funded loans. In fact, Mr. Hopwood acknowledged that he never met Petitioner, and at trial, he only offered adverse testimony against co-Defendant Murray. (T.R. May 5, 2000, pp. 129-130). We find no *Giglio* violation with respect to the testimony of Mr. Hopwood.

Petitioner alludes to other *Giglio* violations, but offers no support save for conclusory arguments. For example, he argues that it was imperative for the Government to place Faller at a particular meeting with Adam, and that "[t]o do this the government again enlisted the false testimony of Colon to show Faller was meeting at the Federal Reserve Bank with Adam and Colon in January, 1994, long after Faller had gone to the authorities." [D.E. 2 at 19]. Notwithstanding the failure to address how this testimony was "imperative" to the

---

[10] Ordinarily, *Giglio* material falls under the umbrella of the *Brady* rule because impeachment material directly affects the credibility of a witness and the "reliability of a given witness may well be determinative of guilt or innocence." *United States v. Aiken*, 76 F. Supp. 2d 1339, 1343-44 (S.D. Fla. 1999) (citing *Giglio*, 405 U.S. at 154). The issue of when *Giglio* material should be disclosed, however, is analyzed separately from *Brady*. *See Aiken*, 76 F. Supp. 2d at 1344. As a practical matter, the fact that this material surfaced post-trial essentially removes the distinction between *Brady* and *Giglio* violations.

Government's case, Petitioner fails to illustrate how this testimony is inaccurate, much less false and misleading.

Petitioner has not pointed to any tangible *Giglio* violations for the other testifying witnesses. Although there are allegations that Dominick Maggio falsely testified about Petitioner's involvement with FQI, Petitioner provides no evidentiary support for this claim, and fails to address how the testimony of Mr. Maggio, even if false, would have affected the judgment in the underlying trial. Several witnesses testified that Petitioner falsely promised them that IBSA had funded loans before, and his rationale as to why the testimony warrants habeas relief is tenuous as best. For example, with respect to the purportedly false testimony of Robert Cameron:

> Robert Cameron gave specific testimony that Faller had told him numerous times that he, Faller had funded deals before. In part of Mr. Cameron's testimony, Cameron testifies that Faller and other codefendants of Faller's high-fived each other and said they had just funded another deal and Cameron made it clear to the jury that this is why he paid his advance fee ... After Cameron testified at trial and left town the Government handed over his 302 interview. Absolutely no mention of high-fiveing (sic) anyone is in the interview or the 302.

[D.E. 2 at 32-33]. Petitioner's argument that this is tantamount to a *Giglio* violation is simply unconvincing.

Under the *Giglio* rubric, we find no violation meriting a new trial under section 2255. Petitioner fails to establish that in the underlying trial, the prosecution knowingly used perjured testimony, or that the prosecutor failed to correct what was subsequently learned to be false testimony. *Terry*, 465 F.3d at 1253. Furthermore, he has not established the second prong under *Giglio*, that the testimony materially altered the jury's verdict. Therefore, we deny Petitioner's habeas motion on this ground.

### 3. Jencks Act

The Jencks Act mandates that a statement by a prospective prosecution witness to an investigative agent or the grand jury must be provided to the defense after the witness has testified on direct examination. 18 U.S.C. § 3500; *United States v. Jordan*, 316 F.3d 1215, 1251 (11th Cir. 2003). In other words, to establish a Government violation of Jencks, Petitioner has to establish (i) that the prosecution took a witness statement, (ii) that the witness testified at trial, and (iii) that the Government subsequently failed to turn over the witness statement.

Although Petitioner attaches several witness statements in his motion to further his Jencks claim, he fails to establish that these statements were not timely disclosed by the Government. In one instance, Petitioner actually purports a Jencks Act violation for an interview that *he* conducted. [D.E. 72 at 1-2]. We find no violations of the Jencks Act that would necessitate granting the Habeas Petition.

### B. *Post-Perez Documents*

Petitioner argues that the *Brady* material has led to the discovery of new evidence, roughly 20,000 exculpatory documents, or *Brady* "fruit." The Eleventh Circuit has concluded that section 2255 motions based on new evidence are subject to the standards generally applicable to motions for a new trial based on new evidence. *Lynn v. United States*, 365 F.3d 1225, 1237 (11th Cir. 2004).[11] There are five requirements that a movant must satisfy before a new trial will be granted based on newly discovered evidence: (i) the evidence was discovered after trial, (ii) the failure of the defendant to discover the evidence was not due to a lack of

---

[11] We could refuse to even address the new evidence in a section 2255 habeas petition. *See Monslave v. United States*, No. 804-CV-1866T-27TBM, 2006 WL 2327291 at *2 (M.D. Fla. Aug. 9, 2006) (claims of newly discovered evidence should be raised in a motion for new trial pursuant to Federal Rule of Civil Procedure 33). Pursuant to Rule 33, the district court may "grant a new trial if the interest of justice so requires." Fed. R. Civ. P. 33(a). In the interest of justice, however, we will still address that evidence here.

diligence, (iii) the evidence is not merely cumulative or impeaching, (iv) the evidence is material to issues before the court, and (v) the evidence is such that a new trial would probably produce a different result. *United States v. Jernigan,* 341 F.3d 1273, 1287 (11th Cir. 2003) (citations omitted). Furthermore, motions for a new trial are highly disfavored, and we must use "great caution in granting a new trial motion based on newly discovered evidence." *Id.* (internal quotation marks and citation omitted). Petitioner would have to satisfy these five requirements to obtain a new trial based on new evidence if the issue was raised on direct appeal. *Lynn*, 365 F.3d at 1237. The standard is arguably high, but certainly no lower, for Petitioner to obtain a new trial based on new evidence through this section 2255 proceeding. *Id.*

Even if we assume that the Post-Perez Documents were discovered after trial and meet the first requirement for a new trial under section 2255, the documents fail at least one, if not all four of the remaining prongs. *Id.* For example, Petitioner's First Supplemental Response [D.E. 30] argues that certain "new evidence," specifically FQI's chapter 7 bankruptcy file, proves that his co-Defendants were actually responsible for founding and maintaining FQI. He believes the bankruptcy file "would have destroyed the case in chief of the Government, as well as their witnesses who clearly testified falsely at trial." [D.E. 30 at 3]. However, bankruptcy filings are public record, and the FQI file could have been discovered with due diligence. At best, the evidence has slight impeachment value, but for the most part it is cumulative. It is not material to the issues before this Court, considering that it does not undercut the Government's claim that Petitioner lied to his investors about having previously funded loans.

Above all, Petitioner fails to establish how this evidence would have produced a different result at trial. The Government's theory was that Petitioner, along with his co-

Defendants, "engaged in a scheme to defraud by lying to the borrowers when they implied and in may cases outright told them that other borrowers had actually received substantial loans from the same European lenders." [D.E. 61 at 3]. Petitioner has failed to show that any of these documents were material to the issues at trial, and that a reasonable probability exists that had the bankruptcy files been disclosed to the defense, the jury would not have convicted Petitioner. *See Lynn*, 365 F.3d at 1237.

The remaining Post-Perez Documents similarly do not convince us to order a new trial. For instance, Exhibit 1 attached to Petitioner's second reply [D.E. 62-1 at 34] is the corporate filing of FQI identifying Natalie Malfa as the Director. Petitioner believes this is proof that he was not associated with FQI. This document could have been discovered with due diligence, considering corporate filings are public record. Regardless, even if the jury was privy to this document, Petitioner fails to establish how it would have had a material impact on the verdict.

As another example, there are documents [D.E. 62-2 at 67-75] pertaining to Mr. Vergote, who testified that Petitioner fraudulently convinced him to pay an advanced fee for a loan. Petitioner argues that these documents shift culpability to Dennis Scheurmann, a co-Defendant. Inculpatory evidence against Scheurmann does not qualify as exculpatory evidence for Petitioner.

We reject Petitioner's argument that this new evidence warrants a new trial. *Lynn*, 365 F.3d at 1237. After carefully reviewing the record and examining all Post-Perez Documents, it is clear that the newly discovered evidence does not meet the threshold for relief under section 2255.

### C.     *Petitioner is Not Entitled to an Evidentiary Hearing*

Because it appears on the face of the habeas motion that Petitioner is not entitled to relief, there is no basis for an evidentiary hearing. A petitioner has the burden of establishing the need for an evidentiary hearing. *See Chiong v. United States,* No. 02-CV-2237-MOODY, 2006 WL 923765, at *3 (M.D. Fla. Apr. 10, 2006) (citing *Birt v. Montgomery*, 725 F.2d 587, 591 (11th Cir. 1984) (en banc), *cert. denied*, 469 U.S. 874, 105 S. Ct. 232, 83 L. Ed. 2d 161 (1984)). Petitioner fails to meet that burden. We may deny relief without an evidentiary hearing if the motion and filed and records of the case reveal that the Petitioner is entitled to no relief. 28 U.S.C. § 2255; *In re Boshears*, 110 F.3d 1538, 1541 n. 1 (11th Cir. 1997) (recognizing that "hearings and findings of fact [are] not required for [a] Section 2255 motion where 'the filed and records of the case conclusively show that the prisoner is entitled to no relief'" (quoting 28 U.S.C. § 2255)). "A hearing is not required on patently frivolous claims or those which are based upon unsupported generalizations. Nor is a hearing required where the Petitioner's allegations are affirmatively contradicted in the record." *United States v. Laetividal-Gonzalez*, 939 F.2d 1455, 1465 (11th Cir. 1991), *rev'd on other grounds*, *Gozlon-Peretz v. United States*, 498 U.S. 395, 111 S. Ct. 840, 112 L. Ed. 919 (1991). The Court finds that the pertinent facts of the case are fully developed in the record before the Court, thus an evidentiary hearing is not required.

### D.     *Petitioner Has Not Shown a Need To File Additional Documents*

Notwithstanding the habeas petition [D.E. 2], the reply to Government's response [D.E. 26], the supplemental brief [D.E. 30], the reply to Government's supplement brief [D.E. 62], and two notices of receipt of new Brady material [D.E. 63, 72], Petitioner asks this Court for leave to file even more exculpatory material stemming from the Perez Documents. The remaining documents Petitioner intends to file "have never been seen by this Court and are

not yet in the record." [D.E. 68 at 2]. Supposedly, this material proves that Petitioner was actually a victim in the fraud scheme, and that the trial testimony of every witness was either incomplete, or outright false. We deny Petitioner's request for several reasons.

Petitioner fails to differentiate between the "large volume of documents" he wants us to consider and the Post-Perez Documents we have already reviewed. Petitioner describes the new material he seeks to disclose, and it is virtually identical to the material he previously submitted to the Court. Considering the Post-Perez Documents did not convince us to order a new trial, supplementary material would be futile. In that same vein, Petitioner obviously disclosed the most pertinent material to support his habeas motion, and *that* material does not warrant relief. Petitioner had an ample opportunity to disclose all pertinent documents in his five previous filings.

Petitioner does not need to submit more evidence to "prove his 2255 and [show that he is] an actual victim in this case." [D.E. 68 at 1-2]. Tellingly, Petitioner had enough evidence at trial to make this argument, as his attorney argued in closing, "Mr. Adam and Mr. Colon are pure, unadulterated absolute crooks. And they together joined in a conspiracy to defraud ... [and] used people like James Faller to accomplish their goals." (T.R. May 24, 2000, p. 122 at 10-18). In this habeas petition, he had even more evidence available, and an ample opportunity to disclose to this Court anything he deemed pertinent. At this stage, additional material would merely be cumulative.

### III.   *CONCLUSION*

Based upon a thorough review of the record as a whole, the various motions filed by the parties, and a review of the underlying trial transcript, it is hereby **ORDERED** that the Motion for Leave to File Lard Volume of Documents [D.E. 68] is **DENIED**. Further, we hereby **RECOMMEND** that Faller's Petition for Writ of Habeas Corpus [D.E. 2] be **DENIED**.

Pursuant to Local Magistrate Rule 4(b), the parties have ten days from the date of this Report and Recommendation to serve and file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge. Failure to timely file objections shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and bar the parties from attacking on appeal the factual findings contained herein. *R.T.C. v. Hallmark Builders, Inc.,* 996 F.2d 1144, 1149 (11th Cir. 1993); *LoConte v. Dugger*, 847 F.2d 745 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982) (en banc); 28 U.S.C. § 636(b)(1).

**DONE AND SUBMITTED** in Chambers at Miami, Florida, this 22nd day of February, 2008.

_____
EDWIN G. TORRES
United States Magistrate Judge

Copies provided to:
Honorable Kenneth L. Ryskamp
All counsel of record

James Faller
P.O. Box 2395
Russell Springs, Kentucky 42642